UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATHAN YOUNG,

Plaintiff,

v.

GOVERNMENT OF THE DISTRICT OF
COLUMBIA, et al.

Defendants.

Civil Action No: 16-1046 (TFH)

## PLAINTIFF MR. YOUNG'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants' Motion for Summary Judgment [27] should be denied for the reasons detailed below.

## STATEMENT OF THE CASE

This case arose from an incident on September 2, 2015 at about 10:30 pm (Fontroy trial transcript, p. 13; Officer Onoja) in the dark, unlighted privately-owned lot on the side of Stanton Liquor at 1044 Bladensburg Rd NE, Washington, DC 20002, between Stanton on the one side and the white house on the other. Pl's Dep. Ex. # 4, Exhibit 11; Pl's Dep. Ex. # 13, Exhibit 12.



The key facts are hotly contested.

But, the parties agree that what started this whole incident was Officer Onoja's order to the 59-year-old Mr. Young to pick up and throw away a beer can which Officer Onoja, at least before confronting Mr. Young, had never checked was open, or even had beer in it, and to leave the area. Both parties agree that Officer Onoja used violence against and assaulted the 59-year-old Mr. Young when he refused to pick up the can and leave. The disputed issues are why and when Officer Onoja assaulted the 59-year-old Mr. Young, and whether Mr. Young ever constructively possessed an open can of beer.

**Mr. Young's background and connection to the Trinidad neighborhood.**

Mr. Young is a 46-year-old man who grew up in Northeast Washington DC about six blocks from Stanton liquor and the Starburst Plaza park which is down the street at the corner of Bladensburg Road and H Street, N.E. Pl's Dep. at 10:1-2; 13:19-21, Exhibit 1. At various times throughout his life he has moved back and forth between that neighborhood and Southern Maryland. *Id.* at 10-12, Exhibit 1. He has been married to Kimberly Young for about 20 years. *Id.* at 15:14-15, Exhibit 1; Carter Dep. at 10:11-12, Exhibit 8. Mr. Young has a 20-year-old daughter who lives with him and his wife. Pl's Dep. at 16:16-17:4, Exhibit 1.

Mr. Young graduated from a vocational school in Harpers Ferry, West Virginia in bricklaying and obtained his GED in about 1986/1987. *Id.* at 18:17-19:4, Exhibit 1.

From January 2013 to around April or May of 2015, shortly before the incident, Mr. Young was employed as a maintenance manager at the Bowie Town Center. *Id.* at 20:15-21, Exhibit 1, and he was promoted at least once. *Id.* at 21:19-22, Exhibit 1. His responsibilities included trash removal, checking lights around the property, and performing general maintenance duties. *Id.* at 21:13-14, Exhibit 1. Prior to his employment with Bowie Town Center, he performed manual labor jobs painting and other odd jobs with a staffing agency. *Id.* at 23:15-24:3, Exhibit 1.

Mr. Young has also worked in Columbia, Maryland putting furniture together. *Id.* at 24:14-22, Exhibit 1.

Mr. Young has strong connections to the Trinidad area. He has many friends in the neighborhood near Stanton Liquor with whom he has grown up and known for at least 20 years. *Id.* at 49:12-50; 50:7-10, Exhibit 1. Up until Officer Onoja violently slammed him to the ground on September 2, 2015, he considered Bladensburg Road near Stanton Liquor and Starburst Plaza park his home. *Id.* at 51:2-8, Exhibit 1.

Now, because of Officer Onoja, he avoids his childhood neighborhood where he has known folks for decades. *Id.* at 51:2-4, Exhibit 1.

**Officer Onoja's Animus Towards Mr. Young and History of Harassing Mr. Young and His Friends.**

Prior to September 2, 2015, Officer Onoja had developed animus towards Mr. Young as evidenced by several instances Officer Onoja harassed him and others in the Trinidad neighborhood. Several incidents with Officer Onoja prior to and including the incident on September 2, 2015 where Officer Onoja violently slammed him to the ground ultimately lead Mr. Young to stop going to his childhood neighborhood where he has known folks for decades. *Id.* at 51:2-4, Exhibit 1. These facts are critical not just in establishing Officer Onoja had animus towards Mr. Young on the night of September 2, 2015 but also reflect several instances where the District was put on notice of Officer Onoja's unconstitutional conduct.

Specifically, before the incident, Officer Onoja had harassed Mr. Young and his friends at least three times that same year. *Id.* at 26:16-22, Exhibit 1. In one instance, in April or May of 2015, Officer Onoja attempted to arrest Mr. Young for drinking a beer on private property, *Id.* at 37:3-6, Exhibit 1, while Mr. Young and his friend, Kevin Byrd, were sitting in Mr. Byrd's fenced in back yard. *Id.* at 41:21-42:2; 38-39; 40:7-8, Exhibit 1. While Officer Onoja did not arrest anyone,

he entered private property and poured beers out that adults were lawfully drinking on private property. *Id.* at 40-41, Exhibit 1.

In about August 2015, Mr. Young and some friends were playing cards in a fenced in yard on private property (*Id.* at 47:1-8, Exhibit 1) that belonged to Phaedra White (Carter Dep. at 31:5-8, Exhibit 8) when Officer Onoja approached in his police cruiser (Pl's Dep. at 47:15-19, Exhibit 1). Even though Mr. Young, Mr. Fontroy, and the others were simply playing cards and not bothering anyone, Officer Onoja ordered everyone onto the ground. *Id.* at 53:14-16, Exhibit 1. Officer Onoja came onto the private property, *Id.* at 55:17-18, Exhibit 1, and then threatened to lock everyone up after noticing a beer can out in the grass (Carter Dep. at 29:13-18, Exhibit 8), six feet from the card table (*id.* at 33:9-11) that had been there for about a week (*id.* at 34:19-22, Exhibit 8). Officer Onoja collected everyone's identification cards to check for warrants. *Id.* at 29:22-30:2, Exhibit 8. Then, he ordered them to stop playing cards. *Id.* at 30: 3-4, Exhibit 8.

Fortunately, Officer Onoja's supervisor showed up, Pl's Dep. at 54:15-17, Exhibit 1, and the supervisor told Officer Onoja Mr. Young and his group had the right to play cards and congregate. *Id.* at 30:6-8, Exhibit 1.  This instance is one example where a superior officer received and responded to a complaint for the way Officer Onoja treated residents, including Mr. Young, in the neighborhood.

In another instance, in about July 2015, Officer Onoja ordered Mr. Young, Mr. Fontroy, and Mr. Carter to stop standing on the grass part of the sidewalk in front of Mudricks (a corner store on Bladensburg Road). Carter Dep. at 18:5-17, Exhibit 8. Standing and hanging out is

something folks have been doing for years in the neighborhood until "everything started to change." *Id.* at 18:8-10, Exhibit 8.[1]

Despite the fact there was room on the sidewalk for others to walk (*Id.* at 18:20-21, Exhibit 8), no one was drinking, no one was using drugs, and no one was doing anything illegal (Carter Dep at 18:22-19:7, Exhibit 8), he ordered them to move. In addition, Officer Onoja physically pushed Mr. Fontroy down the street multiple times about three feet down the street. *Id.* at 19:5-21, Exhibit 8. Like how a parent treats a child, Officer Onoja continued to escort Mr. Fontroy down the street for about eight feet down the sidewalk. *Id.* at 21:9-12, Exhibit 8. Officer Onoja also threatened to lock everyone up. *Id.* at 22:4-6, Exhibit 8. This instance is another example where Officer Onoja used physical force against neighborhood citizens without probable cause and used heavy-handed police tactics to intimidate Trinidad residents.

Officer Onoja is well known in the neighborhood for harassing citizens and getting complaints filed against him. Pl's Dep. at 59:2-9, Exhibit 1; Carter Dep. at 17:9-10, Exhibit 8; Fontroy Dep. at 40:15-16, Exhibit 2. He has also been witnessed using excessive force repeatedly in the neighborhood. Carter Dep. at 57-71, Exhibit 8.  In another instance recounted by Ray Carter, Officer Onoja approached Mr. Carter while he was working on his van on 16th Street Northeast. *Id.* at 23:1-3, Exhibit 8. Officer Onoja rode up to Mr. Carter and demanded to know the contents of his Styrofoam cup under threat of arrest. *Id.* at 23:3-9, Exhibit 8. Mr. Carter requested a "white shirt" or supervising official in MPD to come to the scene. *Id.* at 23:20-24:3,

---

[1] Ordering African Americans who are standing still on the sidewalks or bordering areas to leave the area is part of a larger pattern of the District using its police force to banish African Americans, especially young African American males, from public spaces in gentrifying areas. PCB Policy Report #17-3: Blocking Passage, issued May 23, 2017. https://policecomplaints.dc.gov/sites/default/files/dc/sites/office%20of%20police%20complaints/publication/attachments/Blocking%20Passage%20Report.FINAL_.pdf. Exhibit 46.

Exhibit 8. The supervising officer informed Officer Onoja he did not have the authority to order Mr. Carter to pour his cup out under threat of arrest. *Id.* at 27:13-20, Exhibit 8. This supervising officer is the same officer who responded to the scene where Officer Onoja harassed the group of people playing cards on Phaedra White's property. *Id.* at 32:6-11, Exhibit 8. This instance is another example where a supervising officer received and responded to a citizen complaint against Officer Onoja—putting the District on notice of Officer Onoja's unconstitutional conduct.

In another interaction with Mr. Young, Mr. Carter, and Donald McCormick, Officer Onoja approached them in the same alley they were previously playing cards. *Id.* at 37:12-18, Exhibit 8. Officer Onoja informed them he was watching everyone, knew what type of beer they drink, exactly the time they go to the store, and that was going to catch and arrest them. *Id.* at 37:19-38:2, Exhibit 8. That included telling Ray Carter that Officer Onoja knew that Mr. Carter drank Beck's beer. *Id.* at 42:3-19, Exhibit 8.

**The District Knows about Other Unconstitutional, Violent, Abusive acts of Officer Onoja and Still authorizes Him to Make Arrests and Use Force against His Fellow Citizens.**

In two of these incidents Officer Onoja's abusive, unconstitutional conduct was known to supervisors. But, the MPD did not discipline Officer Onoja for these events and still he's in the field making arrests and authorized to use force. In fact, Officer Onoja was promoted from a patrol officer to a crime suppression team officer in March of 2016. Onoja Dep. (Young Case) 15:1-9, Exhibit 3

The District and Officer Onoja's supervisors know about other violent, abusive acts of Officer Onoja and still authorizes him to make arrests and use force against his fellow citizens. Some examples include:

## JOSEPH ALEXANDER

On August 8, 2015, Officer Onoja falsely arrested Joseph Alexandar for incommoding or "blocking passage" on the sidewalk. According to Officer Onoja, Mr. Alexander and a group of more than six individuals were completely and totally blocking the sidewalk at 1044 Bladensburg Road. *Id.* at 206:1-15, Exhibit 3. Officer Onoja claimed to have personally witnessed this activity. *Id.* at 206:20-207:1, Exhibit 3. After he claims to have given a dispersal order, Officer Onoja claimed that Mr. Alexander came back and stood right back blocking the sidewalk. *Id.* at 207: 8-22, Exhibit 3. Finally, Officer Onoja claimed that Mr. Alexander by himself completely blocked the passage. *Id.* at 207:20-22, Exhibit 3.

Officer Onoja acknowledged the limited circumstances in which an Officer can arrest someone for incommoding. The individual or individuals must totally block the path of travel. *Id.* at 203:3-7, Exhibit 3. If someone could walk around, that does not constitute incommoding. *Id.* at 203:7-9, Exhibit 3. Its not a violation of the statute to stand on the sidewalk when no one else is around. *Id.* at 203:10-15, Exhibit 3. In addition, its not a violation of the statute to walk up and down the sidewalk. *Id.* at 204:1-3, Exhibit 3.

Security footage from Stanton Liquor that captured Officer Onoja and Mr. Alexander's interaction tell a much different story than Officer Onoja's sworn deposition testimony. At 5:07, the surveillance video shows Officer Onoja approach on his bicycle three African American male individuals in front of Stanton Liquor. Exhibit 19. No individuals are trying to walk down the sidewalk. Exhibit 19. The three individuals are clearly not blocking the sidewalk in its entirety. Exhibit 19. At about 5:54, with Officer Onoja still on the scene, the individuals all disburse. Exhibit 19.

Mr. Alexander walks up and down the sidewalk a few times and then goes off camera. Mr. Alexander returns again at about 9:28 seconds. Exhibit 19. At 12:39, Mr. Alexander is seen walking down the sidewalk another time and Officer Onoja immediately places Mr. Alexander under arrest. Mr. Alexander is by himself, not blocking passage, and just walking on the sidewalk. Exhibit 19. Officer Onoja was never investigated for his arrest of Mr. Alexander despite at least one other officer witnessing the unlawful incident. Onoja Dep. (Young Case) 214:1-18, Exhibit 3. When Officer Onoja arrested Mr. Alexander he was acting consistent with MPD custom, policy, and practices. *Id.* at 214:12-15. This false arrest is a text book example of MPD officers banishing young African American males from the sidewalk as discussed in the Office of Police Complaint Report *supra* fn. 1.

## WILLIAM HALL

William Hall is a twenty-six-year-old asthmatic African American mail who frequented the Trinidad neighborhood to often do manual labor on a contract basis. Hall Dep. at 31-32, Exhibit 6. In or about April of 2015, Officer Onoja arrested him for unlawful entry at the 7-Eleven on Bladensburg road. *Id.* at 36:19-20; 37:19-22, Exhbit 6. Mr. Hall used to frequent the 7-Eleven about two times a day throughout 2015. *Id.* at 40:3-8, Exhibit 6. On the day of his first arrest by Officer Onoja, Mr. Hall was walking down the street past the 7-Eleven and Officer Onoja made several inappropriate comments to him. *Id.* at 41:4-9, Exhibit 6. Officer Onoja told Mr. Hall that he "can't walk on this side of the street" and that he "told you [Mr. Hall] to stay off my block to 1200 Bladensburg road." *Id.* at 41:4-13, Exhibit 6.

Officer Onoja chased him and arrested him. *Id.* at 42: 8-10, Exhibit 6. Despite the arrest for unlawful entry, the government declined to file charges against Mr. Hall. *Id.* at 42:15-17,

Exhibit 6. Mr. Hall never actually entered the 7-Eleven where he was purportedly barred but Officer Onoja arrested him nonetheless while he was walking to the Dollar Plus store. *Id.* at 46:5-13, Exhibit 6. At least two other MPD officers participated in this unlawful arrest. *Id.* at 53:17-20, Exhibit 6.

Officer Onoja slammed Mr. Hall up against a vehicle after placing him in cuffs. *Id.* at 54:11-16, Exhibit 6. During 2015, Mr. Hall had more than 10 interactions with Officer Onoja he considered harassment. *Id.* at 55:17-21, Exhibit 6. Officer Onoja would follow Mr. Hall down the street for no reason. *Id.* at 56: 5-12, Exhibit 6. Officer Onoja repeatedly told Mr. Hall to stay off the 1200 block of Bladensburg Road. *Id.* at 56:18-29, Exhibit 6.

Officer Onoja would often call out Mr. Hall's name in front of people in the neighborhood to give off the perception Mr. Hall was a "snitch." *Id.* at 59:2-7, Exhibit 6. Such conduct put Mr. Hall's safety in jeopardy. *Id.* at 59:6-7, Exhibit 6. On other days, Officer Onoja would just follow Mr. Hall around for 10 to 15 minutes. *Id.* at 82:8-13, Exhibit 6. One week prior to a use of force incident with Mr. Hall, Officer Onoja told Mr. Hall was "was going to get him." *Id.* at 84: 8-19, Exhibit 6.

On October 27, 2015, Officer Onoja did in fact "get" Mr. Hall.  Mr. Hall was walking down Bladensburg road with a friend when he first noticed Officer Onoja on a bicycle. *Id.* at 100:4-8, Exhibit 6. Officer Onoja approached him on his bicycle on the sidewalk of Bladensburg Road in front of the Denny's.  *Id.* at 102: 8-17, Exhibit 6. Officer Onoja told Mr. Hall and his friend they needed to leave the sidewalk and then proceeded to follow them once they started walking away. *Id.* at 103:8-21, Exhibit 6. Officer Onoja continued to follow Mr. Hall who was walking on foot directly behind him on the sidewalk on his bicycle. *Id.* at 105:12-22, Exhibit 6.

Mr. Hall asked Officer Onoja to stop following him. *Id.* at 107:7-8, Exhibit 6. Despite Mr. Hall's repeated requests for Officer Onoja to stop harassing him, Officer Onoja followed him to the gas station and ordered him to leave while Mr. Hall was in line waiting to purchase a cigar and some candy. *Id.* at 109:14-110:4, Exhibit 6. Mr. Hall left the store and went to the Dollar Plus on Bladensburg Road. *Id.* at 112:1-6, Exhibit 6. Undeterred, Officer Onoja continued to follow him and waited outside the Dollar Plus Store. *Id.* at 112:1-6, Exhibit 6.

Mr. Hall continued walking down Bladensburg road when Officer Onoja rode up behind him, jumped off his bike and grabbed Mr. Hall by the arm. Exhibit 17, 00:10:20. Mr. Hall asked why Officer Onoja's grabbed his arm and Officer Onoja stated "you're resisting arrest" to which Mr. Hall asked Officer Onoja what was his probable cause to arrest him. Hall Dep. 119:19-120:2, Exhibit 6. Officer Onoja told Mr. Hall that he did not need probable cause. *Id.* at 120:3-4, Exhibit 6. A struggle ensued and Officer Onoja slammed Mr. Hall to ground, punched Mr. Hall in the face at least five times, and doused Mr. Hall in the face with pepper spray after Mr. Hall was subdued. Exhibit 17, 00:10:25-00:11:40. At all times during his interaction with Mr. Hall, Officer Onoja was acting consistent with MPD policies, customs, and practices. Onoja Dep (Hall Case) 174:22-175:3, Exhibit 7.

## CHAMBERS JUNES

Mr. Hall is not the only citizen Officer Onoja has been quick to pepper spray.  Officer Onoja sprayed Chambers Junes, a resident of the Trinidad neighborhood, in the face with pepper spray while investigating if Mr. Junes' closed Gatorade bottle located in Mr. Junes bike cup holder, contained alcohol. Exhibit 18. Officer Onoja approached Mr. Junes in an alley where Mr. Junes is standing immediately adjacent to his bicycle. Exhibit 18. Officer Onoja's body worn camera does

not capture the volume of the first initial approximately twenty seconds of their conversation. Exhibit 18, 00:00:11-00:00:31.

Mr. Junes attempts to walk his bicycle out of the alley and Officer Onoja follows him. *Id.* at 00:00:31. As Mr. Junes is walking away, Officer Onoja grabbed him from behind, turned him by the shoulder, and doused him in face with pepper spray. *Id.* at 00:01:20:-00:01:24. After Mr. Junes became visibly upset, Officer Onoja slammed him to the ground. Exhibit 18. This incident all stemmed from Officer Onoja spotting an orange yellowish liquid in Mr. Junes Gatorade bottle. Onoja Dep (Young Case) 225:9-15, Exhibit 3. The bottle had a lid on it. Onoja Dep. (Young Case) 225:14-15, Exhibit 3. Mr. Junes was not drinking out of the bottle when Officer Onoja stopped him. *Id.* at 227:5-7, Exhibit 3. Officer Onoja claimed Mr. Junes struck him with his right hand and that his body worn camera captured the incident. *Id.* at 233:16-19, Exhibit 3. However, Officer Onoja's body worn camera video does not show Mr. Junes trike Officer Onoja. Exhibit 18. When Officer Onoja pepper-sprayed Mr. Junes during the course of a POCA arrest, he was acting consistent with MPD customs, policies, and practices. Onoja Dep (Young Case) 233:18-22, Exhibit 3.

Many others are listed from Officer Onoja's personnel file in Mr. Young's Statement of Material Facts and filed under seal based on this Court's Protective Order, and discussed below in the section on the Monell claim.

### The September 2, 2016 Incident:

**Officer Onoja Grabbed Mr. Young by The Wrist And Slammed Him to the Sidewalk Facedown Because Mr. Young Refused Officer Onoja's Order to Pick up the Beck's Can And Leave.**

Officer Onoja ordered Mr. Young to go pick up the can and leave the driveway because there was a no loitering sign on the front of the building facing the sidewalk. Fontroy Dep. at 116, 118, Exhibit 2; Onoja Dep. (Fontroy case) at 16:14-20, Exhibit 4)

Mr. Young refused to pick up the can. Fontroy Dep. at 118, Exhibit 2. It "aint mine"!, he said. Pl's Dep. at 104:10-22, Exhibit 1.

"This going to be your beer," retorted Officer Onoja. *Id.* at 109:2-4, Exhibit 1.

Without saying anything more, without provocation or justification or any legitimate police purpose, Officer Onoja grabbed Mr. Young by the wrist [106:7-9] and tried to pull him over to the Beck's can sitting on the "unpaved ground" which was past the blacktop. Pl's Dep. at 102:4-9, Exhibit 1; Defendants' Ex. 6; Onoja Dep. (Young Case) at 89:18-90:5, Exhibit 3 (*unpaved* ground in the driveway); Pl's Dep. Ex. # 13, Exhibit 12.

Suddenly, without warning, as Officer Onoja grabbed Mr. Young's wrist, "he slammed me down to the ground." Pl's Dep. at 106:6, Exhibit 1. Officer Onoja pulled Mr. Young's arm behind his back, chopped his legs out from under him by kicking him with his foot, and he slammed Mr. Young to the sidewalk. Mr. Young's right shoulder hit the sidewalk. His arms, belly, and knees slammed into the sidewalk. *Id.* at 105:2-109. Exhibit 1. As a result of the brutal assault, Mr. Young had bleeding on his elbows and on his knees; his shoulder and his back have been killing him ever since; and he had bruising on his knees and shoulders. *Id.* at 134:3 to 135:4, Exhibit 1.

a) **Mr. Young never resisted or tried to flee.**

Mr. Young never resisted at any time from when he first saw Officer Onoja ride up until the MPD back-up arrived on the scene. *Id.* at 133:10-134:2, Exhibit 1; Fontroy Dep. at 118-119, Exhibit 2; Exhibit 9 (Cell Phone Video).

> **b)  None of the Bystanders Expressed Anger at Officer Onoja until *after* He Grabbed Mr. Young and Slammed Him to the Ground without Provocation or Justification.**

The sequence of events is crucial here. None of the bystanders spoke or approached Officer Onoja until **after** Officer Onoja had slammed Mr. Young to the sidewalk without provocation or warning. Pl's Dep. at 114:19-22, Exhibit 1; Fontroy Dep. at 119:1-3, Exhibit 2 (Phaedra and Mr. Fontroy got mad and cursed *after* Officer Onoja slammed Mr. Young to ground).

Only then did any of the bystanders complain or protest. Fontroy Dep. at 119:1-3,

Mr. Fontroy was the first to speak. Mr. Fontroy asked Officer Onoja why he slammed Mr. Young to the ground. Pl's Dep. at 114:19-22, Exhibit 1. Mr. McCormick was recording. Mr. Carter was across the street. Ms. White was there also. Other individuals from the neighborhood were present.

At trial in Mr. Fontroy's criminal case that arose from this incident, Officer Onoja claimed the reason he slammed Mr. Young to the ground was to keep Mr. Young and himself safe because "Mr. Page, Ms. White, and a crowd was starting to zero in on me." Fontroy Trial Tr. at 17, Exhibit 5. However, this assertion is false. No one got **angry** or protested until after Officer Onoja had grabbed Mr. Young and slammed Mr. Young to the sidewalk without provocation or warning. Pl's Dep. at 114:19-22; 114:19-22, Exhibit 1; Fontroy Dep. at 119:1-3; 122:1-8; 124:19-22, Exhibit 2 Fontroy Dep. at 121:19-22, Exhibit 2 (Officer Onoja slammed Mr. Young to ground without

telling Mr. Young to get on ground). It is Officer Onoja's violent action in slamming Mr. Young to the ground without provocation that angered the bystanders.

### 1.   Officer Onoja falsely arrested Mr. Young for POCA.

Officer Onoja falsely arrested Mr. Young for POCA. As a result of Officer Onoja's illegal arrest and violent takedown, Mr. Young lost his liberty for several hours when he was in need of medical attention. The officers arrested Mr. Young and they took him to the Fifth District. He was at the 5th District for a few hours. Pl's Dep. at 138:5-19, Exhibit 1. He spent the time at 5th District in a jail cell. *Id.* at 138:14-17, Exhibit 1.

### 2.   Mr. Young suffered injuries from the brutal assault by Officer Onoja and he immediately sought medical treatment at the hospital after he left "5 D."

As a result of the brutal assault, Mr. Young had bleeding on his elbows and on his knees; his shoulder and his back have been killing him ever since; and he had bruising on his knees and shoulders. *Id.* at 134:3 to 135:4, Exhibit 1.

As soon as he was released from the Fifth District police station, Mr. Young walked to Ms. White's home and he got his friend Mr. Carter to drive him to Washington Hospital Center to get treatment for his injuries. *Id.* at 139:1-141:17, Exhibit 1.

Mr. Young produced the medical records from the visit in discovery.

### STANDARD OF REVIEW

When the plaintiff in a false arrest case shows that he was arrested without a warrant, a rebuttable presumption arises that the arrest was unlawful, and the burden shifts to the District to justify the arrest by showing that it was based on probable cause. <u>Karriem v. District of Columbia</u>, 717 A.2d 317, 320 (D.C. 1998). Moreover, in deciding defendants' motion for summary judgment the Court must credit the plaintiff's version of events, even if uncorroborated and "directly contradictory" to police testimony, and the Court must draw all reasonable inferences in favor of the plaintiff as the nonmoving party. <u>Robinson v. Pezzat</u>, 818 F.3d 1, 8-9 (D.C. Cir. 2016) *citing* <u>Tolan v. Cotton</u>, 134 S. Ct. 1861, 1867 (2014).

Finally, the issue of probable cause in a false arrest case is a mixed question of law and fact that the trial court should ordinarily leave to the jury. <u>Pointer v. District of Columbia</u>, 736 F. Supp. 2d 2, 9 (D.D.C. 2010); <u>Bradshaw v. District of Columbia</u>, 43 A.3d 318, 324 (D.C. 2012). It is only where the facts are undisputed or clearly established that probable cause becomes a question of law for the court. <u>Id</u>. otherwise, as here, the question is one for the jury. <u>Id</u>.

I.   **Defendants' Motion for Summary Judgment Should be Denied on Both the 4th Amendment False Arrest Claim and the Common Law False Arrest Claim.**

Defendants' motion for summary judgment should be denied because Officer Onoja has failed to rebut by uncontroverted facts the presumption that his warrantless arrest of Mr. Young for POCA lacked probable cause. <u>United States v. Bowyer</u>, 985 F. Supp. 153, 156 (D.D.C. 1997)(in warrantless arrests, government bears burden of proving arrests were legal).

Moreover, Officer Onoja is not entailed to qualified immunity because taking Mr. Young's version of facts as true, it was not objectively reasonable for Officer Onoja to believe that his actions were lawful at the time of the arrest. <u>Simpson v. City of New York</u>, 2015 U.S. App. LEXIS 12163, *21 (2d Cir. 2015).

Similarly, Officer Onoja failed to justify his arrest of Mr. Young on common law grounds because he failed to establish by objective, uncontroverted facts that he had a good faith basis to believe that he had probable cause to arrest Mr. Young for POCA. Scales v. District of Columbia, 973 A.2d 722, 729 (D.C. 2009).

### A. Officer Onoja Lacked Probable Cause to Arrest Mr. Young for POCA under Either the 4th Amendment or the Common law.

The defendants do not carry their burden of establishing that Officer Onoja had probable cause to arrest Mr. Young for POCA on either an actual possession or a constructive possession theory. *See* Bowyer, 985 F. Supp. at 156.

There are three distinct elements for a POCA charge: (1) possessing (2) an open can of alcohol containing more than one-half of 1% of alcohol by volume; (3) in an area prohibited by the statute. D.C. Code § 25-1001(a)(2) (2012); Campbell v. United States, 163 A.3d 790 (D.C. 2017).

Probable cause to arrest requires the arresting officer to show at least some evidence supporting each element of the offense. Hall v. District of Columbia, 867 F.3d 138 (D.C. Cir. 2017). Therefore, a lack of probable cause an any one of the three elements means that Officer Onoja lacked probable cause to arrest Mr. Young for POCA on a constructive possession theory. Defendants failed to produce evidence on any of the three elements so Officer Onoja did not have probable cause to arrest Mr. Young for POCA.

### 1. Officer Onoja Lacked Probable Cause to Arrest Mr. Young for POCA Because Whether Mr. Young Possessed the Becks Can Officer Onoja Saw on the "Unpaved Ground" in the Driveway," is a Disputed, Material, Issue of Fact That Precludes Entry of Summary Judgment for the Defendants.

Officer Onoja entered the driveway on his bicycle from the public service alley that runs parallel to Bladensburg Road, N.E, behind Stanton Liquor and he says that he as he rode up: (1)

he saw a Becks can "sitting on the *unpaved* ground in the driveway," and (2) Mr. Young was standing right beside it. Onoja Dep. (Young Case) at 89:18-90:5, Exhibit 3 (emphasis added). Pl's Dep. Ex. # 13 shows the rear of Stanton and the drive looking up toward the sidewalk on Bladensburg Road, N.E. Exhibit 12 (authenticated by Mr. Young at Exhibit 1, 171:13-172:14).

Officer Onoja concedes that there is no evidence that Mr. Young actually possessed the Becks can Officer Onoja saw on the unpaved ground in the driveway. Officer Onoja concedes that he never saw Mr. Young drink from any can, Onoja Dep. (Young Case) at 91:4-6, and Officer Onoja also concedes that he never saw Mr. Young touch any can. Fontroy Trial Tr. at 23:20-24:1, Exhibit 5. Officer Onoja did not see Mr. Young drop the can nor did Mr. Young say it was his. Onoja Dep. (Young Case) at 89-91, Exhibit 3; Defendants' Ex A. No one had complained about people drinking in the driveway and no one had told Officer Onoja they had seen Mr. Young with the can. *Id.*

The most Officer Onoja alleges is that Mr. Young "constructively" possessed (Fontroy Trial Tr. at 23:23-25, Exhibit 5) the Becks can Officer Onoja saw on the "*unpaved* ground" in the alley. Onoja Dep. (Young Case) at 89:18-90:5, Exhibit 3 (emphasis added). There is no evidence of constructive possession on Mr. Young's version of the facts, even assuming for the sake of argument that the can Officer Onoja saw on the unpaved ground were open or contained some alcohol.[2]

---

[2] In Perkins, the District of Columbia Court of Appeals upheld a trial court's finding for purposes of a suppression motion that the searching officer had probable cause that both a driver and a passenger in a car possessed an open container of on a constructive possession theory. Perkins v. United States, 936 A.2d 303, 304 (D.C. 2007). But, in Perkins, the searching officer saw an open 24-ounce can of malt liquor balanced against the gear shift on the center console, midway between the driver and appellant. The officers recovered the can and found it to be half-full. Both passenger and driver, the car's only occupants, denied possessing the malt liquor; each claimed that it belonged to the other. Perkins, 936 A.2d at 305.

The facts of this case are distinguishable. The key to constructive possession in Perkins was close proximity (arms reach) in a closed environment, a car. Instead of a closed car, Officer Onoja saw a can in a driveway or alley (next to a

Moreover, by the time Officer Onoja arrived in the drive, several people were in the driveway, including Ms. White, Mr. Fontroy, and Mr. Carter. Pl's Dep. at 102:20-103:5, Exhibit 1 (Mr. McCormick); Fontroy Dep. at 116:7-9, Exhibit 2 (Mr. Fontroy); Fontroy Trial Tr. at 15:1-2, Exhibit 5 (Ms. White). At about 10:30 pm, when Officer Onoja came up the alley, it was already dark in the alley, Defendants' Ex. G (video), Fontroy Trial Tr. at 19:7-8 (Officer Onoja); 36:7-8 (Mr. Fontroy), Exhibit 5.

Anyone of them could have possessed the can. Officer Onoja does not know how the can got there, Onoja Dep. (Fontroy Case) at 20:11-14, Exhibit 4, so someone else may have left it before he got there. Officer Onoja did not check the alley or the drive for cans earlier in the night so he does not know how long it was there. Or, he may have mistaken one of the people in the dark drive for Mr. Young, including Mr. Carter whom Officer Onoja knew to drink Becks beer.

Mr. Young flat out denies that he was in the alley as Officer Onoja came up. Pl's Dep. at 103:21-104:7, Exhibit 1. The closest Mr. Young ever got to the alley was the sidewalk in front of the alley. *Id.* at 103:21-104:7, Exhibit 1. The "Y" on Pl's Dep. Ex. # 4 marks the spot where Mr. Young was standing on the sidewalk as Officer Onoja rode his bicycle to the sidewalk. Exhibit 11. Mr. Fontroy also said that Mr. Young was standing on the sidewalk and that he did not go into the alley. Mr. Fontroy did see a can in the alley. Fontroy Dep. at 116:10-12, Exhibit 2. Mr. Fontroy says Mr. Young was about eight to ten feet from the can in the alley. *Id.* at 116:10-12, Exhibit 2. Mr. Young did see not see a can in the alley but he does not controvert for purposes of this motion that Officer Onoja did see a can in the alley.

---

liquor store) that links Bladensburg Road, N.E., a well-used thoroughfare, and a service alley behind the liquor store. Moreover, in Perkins both the passenger and the driver were within arms reach of the can. Here, Mr. Young was never closer than eight to ten feet to the can Officer Onoja saw in "the unpaved ground." Fontroy Dep. at 116:10-12, Exhibit 2.

Another measure of how far Mr. Young was from the Becks can "sitting on the ***unpaved*** ground" in the alley is Officer Onoja's description of the can as "sitting on the ***unpaved*** ground" in the alley. Onoja Dep. (Young Case) at 89:18-90:5 (emphasis added); 79:4-19 (ground in alley where Officer Onoja was standing was unpaved), Exhibit 3. Pl's Dep. Ex. # 13 is a daytime shot of what the alley looked like from the rear looking towards the front of Stanton's. Exhibit 12; Pl's Dep. at 171:13-172:2, Exhibit 1. Visible in the alley is a strip of black top running from the sidewalk to the rear. The blacktop stops about where the man in the picture is standing. From that point to the rear the alley is gravel with grass growing along the side of the Stanton building. Officer Onoja testified that he saw the Becks can "sitting on the ***unpaved*** ground" in the alley. Onoja Dep. (Young Case) at 89:18-90:5 (emphasis added). So, the place where Officer Onoja saw the "Becks alley can" was at least as far from the sidewalk (where Mr. Young was standing) as where the man is standing in Pl's. Dep. Ex. # 13, Exhibit 12.

Pl's Dep. Ex. # 4 and Pl's Dep. Ex. # 13 set forth below side by side illustrate Mr. Young's version of events and show that Mr. Young, who never left the sidewalk in front of Stanton, and he could not have constructively possessed the can which Officer Onoja saw way down in the "unpaved ground" of the driveway. Exhibits 11, 12.

 

Mr. Carter specifically disputes Officer Onoja's testimony that Mr. Young smelled of alcohol or that Mr. Young exhibited signs of intoxication, Carter Dep. at 82:11-16, 81:9-82:16, Exhibit 8, so those facts have to be removed from the probable cause analysis. Plaintiff's Opposition to Defendants' SMF ¶ 7.

So, whether Mr. Young possessed the Becks can Officer Onoja saw on the "*unpaved* ground" in the driveway, Onoja Dep. (Young Case) at 89:18-90:5, Exhibit 3 (emphasis added), is a disputed, material, issue of fact precluding entry of summary judgment.

    a.  **Different Can, Different Place: Officer Onoja Never Knew Before or at the Time He Seized Mr. Young That Mr. Young Had an Open Can of Beer in Front of Stanton by the Phone Booth so that Can Cannot be Considered in the Probable Cause Analysis of Whether Mr. Young Constructively Possessed the Can Officer Onoja Saw on the "Unpaved Ground" in the Driveway.**

The probable cause test is based entirely on the objective facts as they existed before and at the time of the arrest as they were known to the officer. <u>Devenpeck v. Alford</u>, 543 U.S. 146, 152-153 (U.S. 2004).

Officer Onoja concedes that he never saw Mr. Young drink from any can, Onoja Dep. (Young Case) at 91:4-6, Exhibit 3, and Officer Onoja also concedes that he never saw Mr. Young touch any can. Fontroy Trial Tr. at 23:20-24:1, Exhibit 5. Officer Onoja did not see Mr. Young drop the can nor did Mr. Young say it was his. Onoja Dep. (Young Case) at 89-91, Exhibit 3. No one had complained about people drinking in the driveway and no one had told Officer Onoja they had seen Mr. Young with the can. *Id.* at 90:21-91:4. Officer Onoja also never saw Mr. Young take a drink of any beer can. *Id.* at 91:5-7. Therefore, before and at the time of Mr. Young's arrest Officer Onoja had no knowledge on any objective facts that Mr. Young actually possessed any beer can. <u>Devenpeck</u>, 543 U.S. at 152-153.

The most Officer Onoja alleges is that Mr. Young "constructively" possessed (Fontroy Trial Tr. at 23:23-25, Exhibit 5) the Becks can Officer Onoja saw on the "*unpaved* ground" in the alley. Onoja Dep. (Young Case) 89:18-90:5(emphasis added).

Mr. Young concedes that he possessed an open can of beer by the phone booth (the "phone booth can") in front of Stanton before Officer Onoja got out to the front of the store. Pl's Dep. at 101:1-13, Exhibit 1; Pl's Dep. Ex. # 4, Exhibit 11, at the "P" (authenticated by Mr. Young at 159:3-18); Defendants' SMF ¶ 6. However, it is undisputed that Officer Onoja never saw that conduct. The "phone booth can" is not the "Becks alley can" Officer Onoja saw sitting on the *unpaved* ground in the alley. Onoja Dep. (Young Case) at 89:18-90:5, Exhibit 3; Plaintiff's Opposition to Defendants' SMF, ¶ 7. Different can, different place.

Defendants' SMF ¶ 7 mistakenly conflates the beer by the phone booth (Pl's Dep. Ex. # 4 at "P," Exhibit 11) with the "Becks alley can" Officer Onoja saw sitting on the *unpaved* ground in the alley. Onoja Dep. (Young Case) at 89:18-90:5. As a result, defendants' SMF ¶ 7 mistakenly gives the misleading impression that the "phone booth can" and the "Becks alley can" are the same can in the same place. Not so - Different can, different place.

Since Officer Onoja did not see Mr. Young with a can of beer by the phone booth (Pl's Dep. Ex. # 4, Exhibit 11, at the "P"), and since the "phone booth can" is different can in a different place from the "Becks alley can," Mr. Young 's conduct in front of Stanton by the phone booth cannot be considered in the probable cause analysis of whether *before or at the time* Officer Onoja seized and arrested Mr. Young, Officer Onoja had facts indicating that the "Becks alley can" he saw in the alley was open or had had beer in it. <u>Devenpeck v. Alford</u>, 543 U.S. at 152-153. The only can that counts for the probable cause analysis is the Becks can "sitting on the *unpaved* ground" in the alley. Onoja Dep. (Young Case) at 89:18-90:5(emphasis added). The closest Mr. Young ever got to the "alley can" was eight to ten feet. Fontroy Dep. at 116:10-12, Exhibit 2.

Officer Onoja himself never suggests that the two different cans are the same can or that he saw Mr. Young holding a can.

### b. The District's Presentation of the Probable Cause facts, In Their Motion and Especially as Set Forth in SMF ¶ 6 and 7, Gives a Misleading Picture of What Happened That Night.

The District's presentation of the probable cause facts, in their motion and especially as set forth in SMF ¶ 6 and 7, gives a misleading picture of what happened that night because the District mistakenly conflates what Mr. Young was doing in the front of the store by the phone booth **before** Officer Onoja arrived with what Officer Onoja did 12 to 14 feet away by the driveway **after** Officer Onoja arrived. The facts known to Officer Onoja at the time of Mr. Young's arrest do not establish probable cause for POCA.

In support of its assertion that Officer Onoja had probable cause to arrest Mr. Young, the District relies on the following facts. First, the District argues that Officer Onoja was familiar with Mr. Young's choice of drink. Def. Mot. At 5. Second, the District cites Plaintiff's candid admission in his deposition testimony that he was in fact drinking a Beck's beer immediately prior to Officer Onoja approaching. *Id.* Third, the District argues that Officer Onoja approached Mr. Young and he had an approximately half full can of beer "near" him and smelled of alcohol. *Id.* Finally, the District argues that Plaintiff "appeared intoxicated" to Officer Onoja.  *Id.*

In each of these instances, the District leaves out crucial record evidence that reflects material facts in dispute, cherry picks from the record, and overgeneralizes to conflate facts. Setting aside the fact that Mr. Young cannot be the only person who drinks Beck's beer in Trinidad,[3] specific record evidence reflects that Officer Onoja also knew Ray Carter (who was present on the scene) also drank Beck's beer. In addition, where Mr. Young was located in relation to which

---

[3] A very reasonable inference to draw in Plaintiff's favor is that if Stanton Liquor carried Beck's beer, obviously a demand for it existed, which undercuts any assertion that Mr. Young is the only person who consumes Beck's beer.

specific can is a hotly contested issue of material fact in dispute. Finally, record evidence further reflects that Mr. Young did not smell of alcohol and did not appear intoxicated. Accordingly, the District's argument that Officer Onoja had probable cause should be rejected because at a minimum the purported facts Officer Onoja relied on are in dispute.

### 2. Officer Onoja Lacked Probable Cause to Arrest Mr. Young for POCA Because He Never Checked to See Whether the Becks Can he Saw on the Unpaved Ground in the Driveway Was Ever Opened, Or, If Opened, Contained Beer.

Failing to take even "even the simplest steps" to confirm whether a suspect committed an essential element of the offense vitiates probable cause on that element. *See* Hall v. District of Columbia, 867 F.3d 138, *32. Officer Onoja's failure to check whether the can of Beck's he saw on the "unpaved" area of the driveway was open robs the arrest of probable cause because a lack of evidence on just one of the elements of an offense defeats probable cause. Hall v. District of Columbia, 867 F.3d 138 (D.C. Cir. 2017)(probable cause to arrest requires at least some evidence supporting each element of the offense). Without checking the can, Officer Onoja simply arrested Mr. Young for being in some factually disputed vicinity of trash on the ground outside a liquor store.

The signature element of POCA is an ***open*** container of ***alcohol***. D.C. Code § 25-1001 (a)(2). But, there is no evidence in the record that before grabbing Mr. Young and arresting him, Officer Onoja "took even the simplest steps" to verify whether **the Becks can he saw on the unpaved ground in the driveway was ever open.** Fontroy Dep. at 134:3-7, Exhibit 2 (Officer Onoja never touched the can or picked it up); Onoja Dep. (Fontroy case) at 30:5-10, Exhibit 4; Onoja Dep. (Fontroy case) at 20:15-21:2; discussion, *supra*.

Similarly, Officer Onoja never checked to see whether the can had any beer in it. An open container is not contraband under the POCA statute unless it contains alcohol. United States v. Hemingway, 930 F. Supp. 2d 11, 13 (D.D.C. 2013)(whether officer had probable cause to arrest

defendant for POCA in the context of a motion to suppress). The fact that the can was a beer can has significance only if it had beer in it, or there is ample reason to believe there is beer in it — an empty can presents no violation whatsoever. Hemingway, 930 F. Supp. 2d at 13. Condensation on the outside of a can is equally consistent with an inference that the can was full but not open, or recently drained and tossed. At this stage, all inferences must be drawn in Mr. Young's favor.

No reasonable officer would have arrested Mr. Young for POCA, as Officer Onoja did, without even attempting to verify that the container either had been opened, or whether it even had any beer in it. Hall, 867 F.3d 138, *36 (evaluated under the second prong of the qualified immunity analysis, officer acted unreasonably by arresting restaurant patron for theft of services without even attempting to verify that patron indeed refused and did not intend to pay her bill). See Hall v. District of Columbia, 867 F.3d 138, *32.

Officer Onoja describes the scene in detail.

It was already dark at the time, so dark that cars on the street had their headlights on, as the video of part of the incident shows. Exhibit 9. Officer Onoja himself concedes that it was dark in the alley. Fontroy Trial Tr. at 19:7-8, Exhibit 5;; Onoja Dep. (Fontroy Case) at 36:7-8, Exhibit 4. In fact, Officer Onoja had to shine his police flashlight on the can just to be able to see the Beck's can. Onoja Dep. (Fontroy Case) at 20:15-21:2, Exhibit 4.

Officer Onoja never touched the can. Fontroy Dep. at 134:3-7, Exhibit 2 (Officer Onoja never touched the can or picked it up); Onoja Dep.(Fontroy case) at 30:5-10, Exhibit 4; Onoja Dep. (Fontroy case) at 20:15-21:2. In fact, he never described approaching the can in any of his depositions. He never described any aspect of the position of the can, for example, was it on its side, upside down, leaking liquid.

Officer Onoja believed from shining his flashlight on the can and from looking at (but not touching) the can that there was liquid in the can, and that the liquid in the can was cold, because

he testified that he could see condensation dripping down the side of the can. Onoja Dep. (Fontroy Case) at 20:15-21:2, Exhibit  4 . The beer could have just come from Dante's frozen last Circle of Hell, rivulets of condensation flowing down the sides, but that says nothing about whether it had ever been opened.

The alcohol-content element of the POCA statute can be proved by circumstantial evidence, including "the judgment of police officers who testified, based on their experience and good-faith sensory observations, as to the identity of an allegedly alcoholic beverage." Workman v. United States, 96 A.3d 678, 681 (D.C. 2014).

But, all of Officer Onoja's observations are equally consistent with a full, cold, ready to drink, **un-opened** can. Or, for that matter, an opened can that has just been drained of all liquid by a thirsty drinker and tossed on the ground. Regardless, the record is devoid of evidence that Officer Onoja ever checked to determine whether the can was open or contained alcohol. The record reflects that he arrested Mr. Young for being in a disputed vicinity to a piece of litter outside a liquor store and for refusing to pick up that litter.

Since at this stage all inferences have to be drawn against the movant, Officer Onoja. Tolan, 134 S. Ct. at 1867; Robinson, 818 F.3d at 8-9. For purposes of this motion, the beer can Officer Onoja saw in the driveway was un-opened, or empty. In fact, if the can had sweated enough condensation for the condensation to be seen at night in a dark driveway by the light of a flashlight the inference is that the can is full, or recently drained. Only a full or recently drained can would produce that much condensation.

None of the other observations Officer Onoja made about Mr. Young - he believed he smelled of alcohol, he believed exhibited signs of intoxication, Mr. Young drinks Beck's, he saw Mr. Young with a beer in 2015 – provide circumstantial evidence as to whether the can on the unpaved ground in the driveway was open. Moreover, Mr. Carter controverts Officer Onoja's

testimony that Mr. Young smelled of alcohol or that Mr. Young exhibited signs of intoxication, Carter Dep. at 82:11-16, 81:9-82:16, so those facts have to be removed from the probable cause analysis.

Officer Onoja said Mr. Young's breath smelt like alcohol but he never said that the Beck's can, or any liquid that might have been in it, smelt like alcohol. He never smelt the Beck's can before he arrested Mr. Young. He just leapt to the conclusion as he rode past the can in a dark driveway that it was open.

In fact, Officer Onoja and the District concede that the Beck's can Officer Onoja saw on the "unpaved ground" in the driveway was un-opened because they never allege that it was opened in their Statement of Material Facts. See Defendants' SMF, ¶ ¶ 6-7. In ¶ 6 defendants allege that:

> During deposition, Plaintiff testified that on September 2, 2015, after he heard "Donald" say "[h ]ands up," he put his approximately half full can of beer down **near a phone booth in front of Stanton Liquors, and went to look in the alley**. Pl's Dep. at 100:10-20, 128:8- 20, Exhibit B. When asked to place a circle in the area of a photograph where he says he placed the open container of beer, he did so. Pl's Dep. at 152:20-154:15 & Exhibit 1, Exhibit A. (emphasis added)

Defendants' SMF, ¶ 6. Defendants here focus on the can of beer Mr. Young had out in front of Stanton where the phone booth used be. Ps. Ex. # 1 and Ps. Ex. # 4 ("P" in a circle). Wrong can, wrong place.

The Becks can Officer Onoja saw was "sitting on the *unpaved* ground" in the alley. Onoja depo, 89:18 to 90:5(emphasis added); 79:4-19(ground in alley where Officer Onoja was standing was unpaved). Ps. Ex. # 13.

### 3. Officer Onoja lacked probable cause to arrest Mr. Young for POCA because neither the District nor Officer Onoja established that the "unpaved ground" in the driveway (where Officer Onoja claims he saw a beer near Mr. Young, Onoja depo, 89:18 to 90:5) is one of the areas prohibited by the statute.

In a warrantless arrest the arresting officer has the burden of proving that the arrest was supported by probable cause, so the burden is on Officer Onoja to show that the alley or driveway

or "cut" as Mr. Fontroy called it (Fontroy Dep. at 80:21-81:2, Exhibit 2) is one of the prohibited areas.

Defendants failed to show that that Officer Onoja had any facts on the third and final element of POCA. *See* D.C. Code § 25-1001 (a)(2)("upon any street, alley, park, or parking area"). Neither the District nor Officer Onoja established that the "unpaved ground" in the driveway (where Officer Onoja claims he saw a beer near Mr. Young, Onoja depo, 89:18 to 90:5) is one of the areas prohibited by the statute. *See* D.C. Code § 25-1001 (a)(2)( in "[a] vehicle in or upon any street, alley, park, or parking area").

In fact, the alley or driveway or "cut" is privately owned because the Stanton building and the alley are all part of the same plat of land.  Exhibit 21, Certified Copy of Platt, Office of the Surveyor, Lot 825, Square 4074; Exhibit 22, Certified Copy of Recorded Deed, Lot 825, Square 4074, Recorder of Deeds.

This fact is obvious because the owner at the time, Mr. Stanton, parked used to park his cab in the driveway. Fontroy Dep at 94:9-12; 101, Exhibit 2. The drive is in Officer Onoja's regular patrol area and he is charged with knowing the difference between private driveways and city owned public alleys. The plat shows the alley behind Mr. Stanton's plat is "Public." *Id.* Next to Stanton Liquor where Officer Onoja claims to have encountered Mr. Young is considered part of the private land in Lot 825, Square 4074.

### B. Officer Onoja is Not Entitled to Qualified Immunity on the § 1983 False Arrest Claim Because He Did Not Even Have "Arguable" Probable Cause.

On the qualified immunity issue, even if the arresting officer lacked probable cause for the arrest the arresting officer is still entitled to qualified immunity if it was objectively reasonable for them to believe that their actions were lawful at the time of the arrest. Hall v. District of Columbia, 867 F.3d 138 (D.C. Cir. 2017); Simpson v. City of New York, 2015 U.S. App. LEXIS 12163, *21.

But, the second prong of the qualified immunity analysis entitles the officer to qualified immunity only when, "in light of clearly established law and the information the [arresting] officers possessed," a reasonable officer could have believed the arrest was lawful. Hall, 867 F.3d 138; Simpson, at *22. An officer need only have "arguable" probable cause, which exists "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." Id. Since qualified immunity is an objective analysis and only objectively reasonable mistakes are allowed, Officer Onoja's "good faith" beliefs do not count in the 4th Amendment qualified immunity analysis. Simpson v. City of New York, 2015 U.S. App. LEXIS 12163, *22.

Here, as described above, no reasonable officer could have believed there was probable cause to arrest Mr. Young for POCA on all three elements of the crime. First, Mr. Young was never closer than 8 to 10 feet to the can in an area next to a liquor store that sells lots of Becks all day long. Second, Officer Onoja conceded that he does not know when or how the can got to the alley nor does he say that he checked the lot before Mr. Young and his friends arrived to make sure the lot was clear of Becks cans before Officer Onoja drove up the drive. Finally, even where Officer Onoja claims Mr. Young and the can were located do not fall in a prohibited area of the statute.[4]

Second, Officer Onoja never checked before seizing Mr. Young whether the Becks can were open, or, if open, whether it still had any beer in it. Drawing reasonable inferences in favor of Mr. Young, the can was not open or it was empty. A prudent officer would have performed this simple step and checked. See Hall v. District of Columbia, 867 F.3d 138, *32.

---

[4] In addition, the facts the District cite in further support of Officer Onoja's basis for probable cause are also in dispute. Mr. Young's version of the facts controls for the qualified immunity analysis, and Mr. Carter disputes that Mr. Young's breath smelled of alcohol or that he appeared intoxicated, so those facts must be removed from the analysis. Carter Dep. at 81:9-82:16, Exhibit 8.

Third, it is obvious that the drive is a privately-owned lot – the owner of Stanton parks his car there – so it was unreasonable to arrest someone for POCA there (the Becks can was there although Mr. Young was not).

In addition to the lack of evidence for probable cause, sufficient record evidence exists to demonstrate Officer Onoja had an improper bias or animus towards Mr. Young. In reviewing the second prong of the qualified immunity analysis – whether a reasonable officer could have believed his or her actions were lawful – a court may consider such factors as an officer's biases against the arrestee or their motives. Simpson v. City of N.Y., 793 F.3d 259, 268-60. For example, in Simmons in deciding whether the arresting officer could have reasonably believed his actions were lawful, the Second Circuit considered the inferences raised in that case by the circumstances of the arrest that Officer Nelson (1) was upset by having been rebuffed and (2) was merely demonstrating his dominance. The court held that in light of these inferences "any pretense of reasonableness flies out the window." Simpson v. City of N.Y., 793 F.3d 259, 269

Drawing inferences in favor of Mr. Young, and the absence of probable cause and any justification for the use of force, the use of force was in furtherance of Officer Onoja's desire to express dominance and his personal animus towards Mr. Young, Officer Onoja's desire to clear the area, District's practice of clearing long term residents from the public spaces for the benefits of merchants, developers, and gentrification. Simpson v. City of N.Y., 793 F.3d 259, 268-60(in reviewing the second prong of the qualified immunity analysis – whether a reasonable officer could have believed his or her actions were lawful – a court may consider such factors as an officer's biases against the arrestee or their motives, e.g., demonstrating his dominance).

This case shows every indicator of being a pretext to issue a "dispersal" order to Mr. Young and his friends to leave the area. Officer Onoja told Mr. Young to pick up a can and to leave the alley because of a "no loitering" sign posted by a private owner, not the government of the District

of Columbia. Onoja Dep. (Fontroy case) at 17; *id.* at 29 ("Not loitering" one of things would have

kept Mr. Young from arrest). PCB Policy Report #17-3: Blocking Passage, issued May 23, 2017

(OPC complaints indicate MPD use blocking statute almost exclusively against African Americans

and homeless).

https://policecomplaints.dc.gov/sites/default/files/dc/sites/office%20of%20police%20complaints/pu

blication/attachments/Blocking%20Passage%20Report.FINAL_.pdf, Exhibit 46.

Moreover, this case illustrates Officer Onoja's *modus operandi* of confronting regular folks

about a quality of life offense such as POCA or "incommoding," and then escalating the incident

into a use of force incident or an APO charge

### C.   Officer Onoja Cannot Establish any Common Law Defenses to Mr. Young's Common Law False Arrest Claim against Officer Onoja.

Even if an arrest lacks actual probable cause, "a false arrest claim can be defeated . . . if the

defendant officers had merely a reasonable, good faith belief that probable cause existed." Liser v.

Smith, 254 F. Supp. 2d 89, 98 (D.D.C. 2003). But this defense is not available to Officer Onoja

because the facts are in dispute and under Mr. Young's version Officer Onoja failed to establish by

objective, uncontroverted facts that he had a good faith basis to believe that he had probable cause

to arrest Mr. Young. Scales v. District of Columbia, 973 A.2d 722, 729 (D.C. 2009).

As described above, Officer Onoja lacked probable cause under both the 4th Amendment

and the common law to arrest Mr. Young for POCA.

Moreover, the common law probable cause standard imposes an additional element which

the 4th Amendment probable cause standard does not. D.C. Code § 25-1001(a), (d) (stating

POCA is a misdemeanor); D.C. Code § 23-581(a)(1)(A), (B) permit warrantless arrests for

misdemeanor offenses like POCA only if the offense were committed in the officer's presence.

United States v. Hemingway, 930 F. Supp. 2d 11, 13-14 (D.D.C. 2013)

This is an additional reason why any of Mr. Young's conduct by the phone booth in front of Stanton's does not count for the probable cause analysis, because it happened outside Officer Onoja's presence. D.C. Code § 23-581(a)(1)(A), (B).

1. **Officer Onoja Lacked A Good Faith Belief That He Had Probable Cause to Arrest Mr. Young**

The facts Mr. Young set forth above to show that Officer Onoja's conduct was not reasonable under the qualified immunity analysis also demonstrate that he lacked subjective good faith to arrest Officer Onoja.

Obviously, Officer Onoja's own statement to Mr. Young, "This going to be your beer," Young Dep. 109:2-4, shows he lacked a subjective belief that his conduct was lawful.

Drawing inferences in favor of Mr. Young, and the absence of probable cause and any justification for the use of force, the use of force was in furtherance of Officer Onoja's desire to express dominance and his personal animus towards Mr. Young, Officer Onoja's desire to clear the area, Officer Onoja's and the District's practice of keeping clearing long term residents from the public spaces for the benefits of merchants, developers, and gentrification.

II. **Defendants' motion for summary judgment on Mr. Young's excessive force and assault and battery claims should be denied because Officer Onoja is not entitled to qualified immunity or a common law privilege.**

The Court should deny Defendant's Motion for Summary Judgment on Mr. Young's excessive force and assault and battery claim for three reasons. First, Officer Onoja is not entitled to qualified immunity on Mr. Young's 4th Amendment Excessive Force Claim. Second, Officer Onoja is not entitled to any common law defenses on Mr. Young's assault claim. Finally, Plaintiff's are not required to provide expert testimony on the issue of Officer Onoja's takedown or any other issue.

A. **Officer Onoja is Not Entitled to Qualified Immunity on Mr. Young's 4th Amendment Excessive Force Claim.**

An officer's act of violence violates the Fourth Amendment if it furthers no governmental interest such as apprehending a suspect pursuant to a valid arrest or protecting an officer or the public. Johnson v. District of Columbia, 528 F.3d 969, 976 (2008). Even in excessive force cases where officers have prevailed, our Circuit has always emphasized that the violence complained of was undertaken in pursuit of a legitimate end. *See* Scott v. District of Columbia, 101 F.3d 748, 760 (D.C. Cir. 1996).

For example, in Scott v. District of Columbia, on which the District's relies, although the Circuit found no Fourth Amendment violation where officers struck a suspect once and pinned him to the ground, because "[a]ll of the officers' actions were reasonably calculated toward the goal of securing [the suspect] and placing him in handcuffs, while minimizing his opportunity to escape," the Court was careful to emphasize that "Nothing in the record indicates that they used more force than reasonably appeared necessary to achieve that goal." 101 F.3d 748, 760 (D.C. Cir. 1996). Here, Officer Onoja had no legitimate end and no need to use force.

In determining whether a police officer used violence in pursuit of a legitimate end a court must consider several factors, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989); Mazloum v. D.C. Metro. Police Dep't, 522 F. Supp. 2d 24, 33 (D.D.C. 2007).

Use of force against a person who has done nothing wrong is gratuitous because there is no legitimate purpose to sustain it. Mazloum v. D.C. Metro. Police Dep't, 522 F. Supp. 2d 24, 34-35 (D.D.C. 2007) *citing* Scott, 127 S. Ct. at 1778 (holding that it is "appropriate . . . to take into account . . . [the] relative culpability" of a plaintiff in resolving an excessive force claim); Westfahl v. D.C., 2015 U.S. Dist. LEXIS 149847, *19.

The violence Officer Onoja used against Mr. Young was, under Mr. Young's version of events, gratuitous because Mr. Young had done nothing wrong. Westfahl, 2015 U.S. Dist. LEXIS 149847, *19 citing Morton v. Kirkwood, 707 F.3d 1276, 1281-82 (11th Cir. 2013) (finding use of force excessive when the officer had no reason to believe that the plaintiff had committed any crime or posed any threat); Mazloum, 522 F. Supp. 2d at 33.

Under Mr. Young's version of events, Officer Onoja grabbed the 59-year-old Mr. Young by his wrist and slammed him to the sidewalk and hand cuffed him there simply because he refused to pick up and leave the area with a can of beer: (1) which did not belong to him, and (2) which Officer Onoja had not even stopped to check had beer in it or had been opened. Plaintiff's Opposition to SMF ¶ 5, 6, 7.

So, Officer Onoja scores a zero on the Graham factors. Mr. Young never committed the offense of POCA or any other offense. Id. Mr. Young did not pose a danger to Officer Onoja or anyone else. Plaintiff's Opposition to SMF ¶ 8. He never resisted or tried to flee. Plaintiff's Opposition to SMF ¶ 8.

Moreover, under Mr. Young's version of events, Mr. Fontroy and Ms. White and the other bystanders got angry and protested, and Mr. Fontroy and Ms. White approached him, only after, and because, Officer Onoja slammed Mr. Young to the sidewalk for no reason. Plaintiff's Opposition to SMF ¶ 9, 10. So Officer Onoja did not "takedown" Mr. Young because he feared the wrath of the crowd, that came after and because of his own use of gratuitous violence against Mr. Young. Plaintiff's Opposition to SMF ¶ 9, 10.

Drawing inferences in favor of Mr. Young, and the absence of probable cause and any justification for the use of force, the use of force was in furtherance of Officer Onoja's desire to express dominance and his personal animus towards Mr. Young, Officer Onoja's desire to clear the area, Officer Onoja's and the District's practice of keeping clearing long term residents from

the public spaces for the benefits of merchants, developers, and gentrification. Exhibit 20, Detective Marlow Video; Incommoding Report.

Defendants suggest that the amount of force Officer Onoja used against Mr. Young was not sufficient to violate the 4th Amendment in the circumstances. Memorandum in support of Motion for summary judgment, p. 9; SMF ¶ 16.

Mr. Young controverts Officer Onoja's description of the force he used. Plaintiff's Opposition to SMF ¶ 16.

Officer Onoja grabbed Mr. Young by the wrist [106:7-9] and tried to pull him over to the Beck's can, Young depo. Pl's Dep. at 102:4-9, Exhibit 1; "he slammed me down to the ground." *Id.* at 106:6, Exhibit 1. Officer Onoja pulled Mr. Young's arm behind his back, chopped his legs out from under him by kicking him with his foot, and he slammed Mr. Young to the sidewalk. Mr. Young's right shoulder hit the sidewalk. His arms, belly, and knees slammed into the sidewalk. *Id.* at 105:2-109, Exhibit 1. As a result of the brutal assault, Mr. Young had bleeding on his elbows and on his knees; his shoulder and his back have been killing him ever since; and he had bruising on his knees and shoulders. *Id.* at, 134:3-135:4, Exhibit 1.

As a result of the brutal assault, Mr. Young had bleeding on his elbows and on his knees; his shoulder and his back have been killing him ever since; and he had bruising on his knees and shoulders. *Id.* at 134:3-135:4, Exihbit 1.

As soon as he was released from the Fifth District police station, Mr. Young walked to Ms. White's home and he got his friend Mr. Carter to drive him to Washington Hospital Center to get treatment for his injuries. *Id.* at 139:1-141:17, Exhibit 1.

Mr. Young produced the medical records from the visit in discovery.

These facts evidence that Officer Onoja used excessive force in the circumstances. <u>DeGraff v. District of Columbia</u>, 120 F.3d 298, 300 (1997); <u>Hall v. District of Columbia</u>, 867 F.3d 138 (D.C. Cir. 2017); Mazloum v. D.C. Metro. Police Dep't, 522 F. Supp. 2d 24, 35 (D.D.C. 2007).


Moreover, drawing all reasonable inferences in favor of Mr. Young, and the absence of probable cause and any justification for the use of force, the use of force was in furtherance of Officer Onoja's desire to express dominance and his personal animus towards Mr. Young, Officer Onoja's desire to clear the area, Officer Onoja's and the District's practice of keeping clearing long term residents from the public spaces for the benefits of merchants, developers, and gentrification. <u>Simpson v. City of N.Y.</u>, 793 F.3d 259, 268-60(in reviewing the second prong of the qualified immunity analysis – whether a reasonable officer could have believed his or her actions were lawful – a court may consider such factors as an officer's biases against the arrestee or their motives, e.g., demonstrating his dominance).

### B.   Officer Onoja is not entitled to any common law defenses on the assault claim.

A police officer is liable for battery when they commit an "intentional act that causes harmful or offensive bodily contact" and when the officer's use of such force was "in excess of that which the actor reasonably believes to be necessary." <u>Hall</u>, 867 F.3d 138 *46-47. "[T]he officer must subjectively believe that he or she used no more force than necessary, but the officer's judgment is [also] compared to that of a hypothetical reasonable police officer placed in the same situation." Id. *citing* <u>Scales v. District of Columbia</u>, 973 A.2d 722, 730 (D.C. 2009).

It is undisputed that Officer Onoja assaulted and battered Mr. Young when he slammed him to the ground. *See* <u>Etheredge v. District of Columbia</u>, 635 A.2d 908, 916 (D.C. 1993). Defendants concede this point they contend only that the assault and battery was privileged.

Under common law assault a police officer has a qualified privilege to use reasonable force to affect an arrest, but only if the means employed are not "in excess of those which the actor reasonably believes to be necessary." Etheredge v. District of Columbia, 635 A.2d 908, 916 (D.C. 1993).

Officer Onoja has no privilege for the force he used because there was no probable cause that Mr. Young had committed an offense in Officer Onoja's presence. Hall, 867 F.3d 138 *46-47.

Alternatively, if there were probable cause, the means employed was "in excess of those which the actor reasonably believes to be necessary." Etheredge v. District of Columbia, 635 A.2d 908, 916 (D.C. 1993). Mr. Young incorporates by reference here the discussion on why the force Officer Onoja used was excessive. The alleged offense was minor and Mr. Young never resisted or posed a threat to Officer Onoja's safety or to the safety of any bystanders, or attempted to flee the scene. Hall, 867 F.3d 138 *46-47.

Therefore, the violence was not in furtherance of a police objective, so it was not reasonable. Hall, 867 F.3d 138 *39.

Conversely, drawing the reasonable inferences in favor of Mr. Young, and the absence of probable cause and any justification for the use of force, the use of force was in furtherance of Officer Onoja's desire to express dominance and his personal animus towards Mr. Young, Officer Onoja's desire to clear the area, Officer Onoja's and the District's practice of keeping clearing long term residents from the public spaces for the benefits of merchants, developers, and gentrification. Simpson v. City of N.Y., 793 F.3d 259, 268-60(in reviewing the second prong of the qualified immunity analysis – whether a reasonable officer could have believed his or her actions were lawful – a court may consider such factors as an officer's biases against the arrestee or their motives, e.g., demonstrating his dominance). Mr. Young's evidence on the assault and battery claim is sufficient

to require its submission to a jury and to preclude entry of summary judgment. <u>Etheredge v.</u>

<u>District of Columbia</u>, 635 A.2d 908, 917 (D.C. 1993).

### C. There was no need for expert opinion testimony on the so-called "tactical takedown" or any other issue.

There was no need for expert opinion testimony on the so-called "tactical takedown" in

this case, Def. Mot at 10-11, because under Mr. Young's version of the facts, there was no "tactical

takedown." Plaintiff's Opposition to defendants' SMF ¶ 11. Officer Onoja grabbed Mr. Young's

wrist and slammed him to the sidewalk because he would not pick up a beer can and leave as

Officer Onoja ordered him to do.

Moreover, under Mr. Young's version of the facts, Mr. Fontroy and Ms. White protested

and cursed him and approached him because he slammed Mr. Young down on the sidewalk and

falsely arrested him. Officer Onoja did not perform a so-called "tactical takedown" in response to

this conduct. Plaintiff's Opposition to defendants' SMF ¶¶ 8-10.

There is no rule in this Circuit or any other Circuit that imposes a *per se* requirement of

expert testimony in excessive force and assault/battery cases involving a police officer. This Court

does not require the use of expert opinion testimony in cases such as this one when the knowledge

is within the ken of a layperson.

There was no need for expert opinion testimony in this case because the means of the

force was pushing someone down on the ground and that is within the knowledge of the average

layperson. "Where force is reduced to its most primitive form—the bare hands—expert testimony

might not be helpful." <u>Kopf v. Skyrm</u>, 993 F.2d 374, 378 (4th Cir.1993). In <u>Kopf</u>, 993 F.2d at 376,

378, a federal district court "ruled in limine that two expert witnesses [the plaintiff] expected to

call" to testify regarding the use of police dogs and slapjacks "would not be permitted to testify"

because "the excessive force standard—'objective reasonableness'—is comprehensible to a lay juror and ... expert testimony would therefore not assist the trier of fact."

As the second Circuit held in Brown, the "assessment of a jury is needed in this case." Brown v. City of N.Y., 798 F.3d 94, 103. The Court continued, the uncertainty "leaves the factual determination of excessiveness to a jury, whose collective common sense, informed by their life experiences, may well exceed that of all the members of this panel." Id.

Thompson v. City of Chicago, 472 F.3d 444 (7th Cir.2006) is another example of a case in which expert testimony on the use of force was deemed not admissible. In Thompson, a police officer involved in subduing a suspect who had led officers on a high-speed automobile pursuit employed a chokehold while other officers handcuffed the suspect. (Id. at pp. 447–448.) The suspect died as a result of asphyxia due to the chokehold. (Id. at p. 448.).

Recently the Seventh Circuit stated,

> Expert testimony about police standards may appropriately assist the jury in resolving some excessive-force questions, but sometimes evidence of this type is unhelpful and thus irrelevant, particularly when no specialized knowledge is needed to determine whether the officer's conduct was objectively unreasonable. The misconduct alleged here was easily within the grasp of a lay jury, so the judge did not abuse her discretion in excluding the expert.United States v. Brown, No. 16-1603, 2017 U.S. App. LEXIS 17403, at *2 (7th Cir. Sep. 8, 2017).

The case defendants cite to was a 1991 District of Columbia Court of Appeals case which used the Frye standard instead of FRE 702 and the Daubert standard. The District of Columbia Court of Appeals did not adopt the Daubert standard until this year. Motorola Inc. v. Murray, 147 A.3d 751, 754 (D.C. 2016) (District of Columbia Court of Appeals adopts FRE 702; when a party proffers expert scientific testimony, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.").

Finally, Mr. Young does not allege negligence so he does not need an expert to establish the standard of care. <u>Dormu v. District of Columbia</u>, 795 F. Supp. 2d 7, 29 (D.D.C. 2011).

Accordingly, Officer Onoja is not entitled to qualified immunity on Mr. Young's excessive force and assault and battery claims. He does not qualify for any defenses under common law. And, finally, contrary to the District's argument, no *per se* rule exists that require Plaintiff's provide expert testimony to opine on whether violently slamming a citizen to the ground

## III.   The District is liable under <u>Monell.</u>

The District has known or should have known about Officer Onoja's open and notorious unconstitutional conduct but the District took no steps or ineffectual steps to correct his behavior and so the District's deliberate indifference to his violations of the rights of the people he encounters is the moving force of those violations. <u>Beck v. City of Pittsburgh</u>, 89 F.3d 966, 973 (3d Cir. 1996) (recognizing that post-event incident "may have evidentiary value for a jury's consideration whether the City and policymakers had a pattern of tacitly approving the use of excessive force.")

"[I]n considering whether a plaintiff has stated a claim for municipal liability, the district court must conduct a two-step inquiry. First, the court must determine whether the complaint states a claim for a predicate constitutional violation. Second, if so, then the court must determine whether the complaint states a claim that a custom or policy of the municipality caused the violation." <u>Sheikh v. District of Columbia</u>, 77 F. Supp. 3d 73, 84 (D.D.C. 2015) citing Baker v. District of Columbia, 326 F.3d 1302, 1306 (D.C. Cir. 2003). Plaintiff satisfies both of these steps as described below for all of his Constitutional claims.

### A.   Plaintiff states a claim for a predicate constitutional violation for both a 4th Amendment false arrest and an excessive force claim.

Plaintiff states a claim for a predicate constitutional violation for both a 4th Amendment false arrest and an excessive force claim.

### B.   Plaintiff states a <u>Monell</u> claim against the District.

For this claims Plaintiff pled a "deliberately indifferent" theory, that is,

> The critical question here is whether the government has failed "to respond to a need . . . in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations."  The inquiry is an objective one—the factfinder must ask "whether the municipality knew or should have known of the risk of constitutional violations."

<u>Lightfoot v. District of Columbia</u>, 273 F.R.D. 314, 321 (D.D.C. 2011).

Cases in other Circuits support the claim. In <u>Beck v. City of Pittsburgh</u>, 89 F.3d 966, 973-74 (3d Cir. 1996), "the plaintiff offered in evidence a series of actual written civilian complaints of similar nature, most of them before and some after [the incident in question], containing specific information pertaining to the use of excessive force and verbal abuse by Officer Williams." The court determined that "[w]ithout more, these written complaints were sufficient for a reasonable jury to infer that the Chief of Police of Pittsburgh and his department knew, or should have known, of Officer Williams's violent behavior in arresting citizens, even when the arrestee behaved peacefully, in orderly fashion, complied with all of the Officer's demands, and offered no resistance."

Furthermore, the court "reject[ed] the district court's suggestion that mere Department procedures to receive and investigate complaints shield the City from liability. It is not enough that an investigative process be in place . . . 'The investigative process must be real. It must have some

teeth. It must answer to the citizen by providing at least a rudimentary chance of redress when injustice is done. The mere fact of investigation for the sake of investigation does not fulfill a city's obligation to its citizens.' . . . Formalism is often the last refuge of scoundrels." (quoting from appellant's brief).

Plaintiff produced detailed facts of incidents both before and after the incident in this case showing how the facts established the elements of Monell claim as follows. Plaintiff set forth the Monell facts above in the section entitled "The District Knows about Other Unconstitutional, Violent, Abusive acts of Officer Onoja and Still authorizes Him to Make Arrests and Use Force against His Fellow Citizens." Plaintiff set forth more detailed facts in plaintiff's here in in his Statement of Material Facts.

Incidents occurring both before and after the arrest and slam down of Mr. Young and the beating and fabrication of evidence claim against Mr. Fontroy support the Monell claim.

In Bordanaro, the First Circuit upheld the trial court's admission of post-event evidence (lack of proper internal investigation and failure to discipline officers involved) for the purpose of establishing what customs were in effect in the City before the King Arthur incident. Id. at 1166. "Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right." Id. at 1167. *Accord* Beck v. City of Pittsburgh, 89 F.3d 966, 973 (3d Cir. 1996) (recognizing that post-event incident "may have evidentiary value for a jury's consideration whether the City and policymakers had a pattern of tacitly approving the use of excessive force."); Foley v. City of Lowell, 948 F.2d 10, 13-15 (1st Cir. 1991); Henry v. County of Shasta, 132 F.3d 512, 518-20 (9th Cir. 1997), *amended on denial of rehearing*, 137 F.3d 1372 (9th Cir. 1998).

IV.    WHREFORE, plaintiff respectfully states that the defendants' motions for summary

judgment should be denied.

| Respectfully submitted, | Respectfully submitted, |
|---|---|
| /s/ William Claiborne<br>WILLIAM CLAIBORNE<br>D.C. Bar # 446579<br>2020 Pennsylvania Ave.,<br>N.W<br>Suite 395<br>Washington, DC 20006<br>Phone 202/824-0700<br>Email<br>claibornelaw@gmail.com | /s/ Joseph A. Scrofano<br>JOSEPH A.<br>SCROFANO<br>D.C. Bar # 994083<br>406 5th Street NW<br>Suite 100<br>Washington, DC 20001<br>Phone (202) 870-0889<br>Email<br>jas@scrofanolaw.com |